| | | |
|---|---|---|
| KIMBERLY GARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01307-JMS-TAB |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY

Plaintiff Kimberly Garner claims she has been unable to return to work at her job with Amazon since July 2016 due to difficulties with urinary incontinence. In the intervening months, Ms. Garner applied for long term disability benefits ("LTD") through an insurance policy issued to Amazon employees by Defendant Aetna Life Insurance Company ("Aetna"). Aetna twice denied Ms. Garner's claim following reviews by a nurse and a urologist concluding that Ms. Garner is not disabled. Ms. Garner then filed this lawsuit against Aetna under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, seeking past benefits, future benefits, and attorney's fees.

Now pending before the Court are the parties' Cross-Motions for Summary Judgment. Ms. Garner's Motion asserts that Aetna's decision was arbitrary and capricious, and that she is entitled to an award of benefits. [Filing No. 19.] Aetna's Motion asserts that its decision was not unreasonable, and seeks a judgment affirming its denial of benefits. Aetna also asserts that should Ms. Garner prevail, a remand for reconsideration is appropriate, not a direct award of benefits. [Filing No. 18.] For the reasons set forth below, the Court **GRANTS IN PART** Ms. Garner's Motion and **DENIES** Aetna's Motion. The Court agrees with Ms. Garner that Aetna's decision

was not supported by substantial evidence, but concludes that remand to Aetna—rather than an award of benefits—is the proper remedy in this instance.

# I.
## LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not suffice to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the party opposing summary judgment. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). When considering cross-motions for summary judgment, the Court views the record in the light most favorable to the non-moving party as to each motion and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *Id.* at 648.

## II.
### EVIDENTIARY ISSUES

Before turning to the merits of Ms. Garner's case, the Court must address several evidentiary challenges raised by Aetna in its response brief.  [Filing No. 20 at 3-20.]  Most of these issues may be summarily addressed.  The Court **OVERRULES AS MOOT** Aetna's objections pertaining to Ms. Garner's wages.  As set forth below, remand is required instead of reversal with an award of benefits.  Therefore, the Court does not need to consider these documents.  The Court **OVERRULES** each of Aetna's objections pertaining to the absence of a citation.  First, as Ms. Garner explains, Local Rule 56-1 requires each party to "support each *fact*" with a citation to admissible evidence, not each sentence.  S.D. Ind. L.R. 56-1(e) (emphasis added).  Aetna's objections to the contrary are unavailing.  Second, Aetna's objections to the absence of a citation where Ms. Garner claims that there is an absence of evidence are nonsensical—the whole point of her assertions is that the record does not establish a particular fact, meaning that no citation would be possible.

The Court **DENIES** Aetna's Motion to Strike Exhibit 1 to Ms. Garner's summary judgment brief.  [Filing No. 25 at 18-19.]  Exhibit 1, [Filing No. 20-1], is Ms. Garner's claim file index and is not evidence—it is simply an index designed to assist the Court.  *Cf.* Fed. R. Evid. 1006.  And assist the Court it did; the voluminous 1850 page administrative record contains many medical and administrative documents, including multiple duplicates, and Exhibit 1 provided a helpful roadmap to speed the Court's consideration of these documents.  Moreover, Aetna had the opportunity to correct any mistakes or misrepresentations it may have found in Ms. Garner's index or to respond with an index of its own.  It did not do so.  Aetna has provided no basis to strike Exhibit 1.

The Court **GRANTS** Aetna's Motion to Strike Exhibit 2 to Ms. Garner's summary judgment brief.  [Filing No. 25 at 18-20.]  Though Ms. Garner has persuasively demonstrated that

this is a proper circumstance for considering evidence outside of the administrative record, *see, e.g.*, *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 1999)* (noting that documents outside the administrative record may be considered "to investigate a claim that the plan's administrator did not do what it said it did"), she has provided no evidence to authenticate the exhibit, *see, e.g.*, *Szymankiewicz v. Doying*, 187 Fed. App'x 618, 622 (7th Cir. 2006)* ("To be admissible, documents must be authenticated by an affiant through whom the exhibits could be admitted into evidence.").  The Court has not considered Ms. Garner's Exhibit 2, [Filing No. 20-2], in ruling on the parties' Cross-Motions for Summary Judgment.[1]

All other objections not specifically addressed are **OVERRULED**.  Consistent with the summary judgment standard set forth above, the Court has considered the parties' factual assertions only to the extent they are supported by citations to the administrative record or reasonable inferences that may be drawn therefrom.

Having resolved these preliminary issues, the Court now turns to the merits.

### III.
### BACKGROUND

The following factual background is set forth pursuant to the standards detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005)*.

---

[1] Moreover, even if the Court had considered it, the additional evidence would not have affected the Court's analysis, as the facts sought to be proven by Exhibit 2 are cumulative of those reflected in Ms. Garner's letter to Aetna regarding Dr. Hale's role in the disability process.  *See* [Filing No. 17-4 at 55]; discussion *infra* Part II.H.

**A. The Long Term Disability Plan**

In July 2012, Ms. Garner began working for Amazon as a "Fulfillment Center Associate I." [Filing No. 17-2 at 87.] As part of Amazon's employee benefits, Aetna issued Ms. Garner an LTD policy (the "Plan"). [Filing No. 17-1 at 1-78.] The Plan provides monthly payments to insureds who are "disabled and unable to work because of [a]n illness [or] injury" when certain conditions are met:

> You will be considered disabled while covered under this Long Term Disability (LTD) Plan on the first day that you are disabled as a direct result of a significant change in your physical or mental condition and you meet all of the following requirements:
> - You must be covered by this plan at the time you become disabled; and
> - You must be under the regular care of a **physician**. You will be considered under the care of a **physician** up to 31 days before you have been seen and treated in person by a **physician** for the **illness**, **injury** or pregnancy- related condition that caused the disability; and
> - You must be disabled by the **illness**, **injury**, or disabling pregnancy-related condition as determined by **Aetna.** (See the *Test of Disability* provision.). [sic]

[Filing No. 17-1 at 5 (emphasis in original).]

The Plan's "Test of Disability" explains how Aetna evaluates disability claims:

> From the date that you first become disabled and until monthly benefits are payable for 24 months you will be deemed to meet the test of disability on any day that:
> - You cannot perform the **material duties** of your **own occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition; and
> - Your work earnings are 80**%** or less of your **adjusted predisability earnings**.
> *After the first 24 months of your disability* that Monthly Benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition.

[Filing No. 17-1 at 6 (emphasis in original).]

"Material duties" are responsibilities that "are normally required for the performance of your own occupation; and cannot be reasonably omitted or modified. However, to be actively at work in excess of 40 hours per week is not a material duty." [Filing No. 17-1 at 26.] The insured's

"own occupation" is defined in terms of how a job is "normally performed in the national economy," without regard to how the insured actually performs the job. [Filing No. 17-1 at 27.] Ms. Garner's position with Amazon was classified as a "medium occupation," which Aetna defined by reference to the Dictionary of Occupational Titles:

> According to the Dictionary of Occupational Titles (DOT). The DOT defines medium work as: exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work."

[Filing No. 17-1 at 133.] Benefits are not payable until an insured is disabled for 180 days, which waiting period is called the "elimination period." [Filing No. 17-1 at 5; Filing No. 17-1 at 70.]

### B. Treatment Records Considered in Aetna's Initial Decision

Ms. Garner has had issues with urinary incontinence dating back to at least 2009. [*E.g.*, Filing No. 17-4 at 9.] On July 25, 2016, Ms. Garner visited urogynecologist Dr. Sameena Rao for surgery to treat her diagnosed conditions of "[u]terovaginal prolapse, ICS stage II, stress urinary incontinence, intrinsic sphincter deficiency, [and] severe detrusor[2] overactivity." [Filing No. 17-6 at 145.] Dr. Rao performed a "Da Vinci assistant supracervical hysterectomy, bilateral salpingo-

---

[2] The detrusor is the "muscle that surrounds the walls of bladder and helps to release urine." Urology Care Foundation, *Overactive Bladder Patient Guide*, http://www.urologyhealth .org/overactive-bladder. Definitions of medical procedures supported by citations to Internet sources have been, in most instances, provided by the parties without dispute and are intended only to aid the reader in understanding Ms. Garner's treatment. Court-provided definitions are consistent with those provided by the parties.

oophorectomy, sacrocolpopexy,[3] Coaptite[4] x [times] 3, transurethral injections and cystoscopy[5]."

[Filing No. 17-6 at 145.] Dr. Rao observed during the cystoscopy that the "bladder was normal with no defects, suture, mesh or other abnormalities within the bladder or urethra." [Filing No. 17-6 at 146.] Aside from one attempt to return to employment at Amazon, discussed below, Ms. Garner has not worked since her July 25, 2016 surgery.

On August 18, 2016, Dr. Rao again saw Ms. Garner. Dr. Rao noted that Ms. Garner was "[d]oing well" post-surgery with regard to her "[i]ncomplete uterovaginal prolapse," but concluded that "intravesical Botox"[6] would be an appropriate procedure to treat her continued incontinence. [Filing No. 17-4 at 44.] Botox carries a 20 percent risk of a need for self-catheterization due to difficulties with bladder emptying and is reserved for women for whom other treatments have failed. [Filing No. 17-6 at 119; *see also* Filing No. 17-5 at 147 (discussing "risk of postoperative urinary retention").] Dr. Rao noted that testing showed a "diminished bladder capacity" and that she continued to suffer from two types of incontinence (mixed

---

[3] A uterosacral colpopexy is frequently performed along with a hysterectomy to address pelvic organ prolapse. Charles R. Rardin, et al., *Uterosacral Colpopexy at the Time of Vaginal Hysterectomy*, J. Reprod. Med., May 2009, at 273, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2922954/pdf/nihms207270.pdf.

[4] Coaptite is a urethral injection used to treat leakage caused by a weak urinary sphincter by bulking up the urethral wall. U.S. Nat'l Library of Med., *Urinary Incontinence – Injectable Implant*, MedlinePlus (Feb. 5, 2017), https://medlineplus.gov/ency/article/007373.htm.

[5] A cystoscopy is a procedure that permits a doctor to examine the interior of a patient's urethra and bladder via a device inserted through the urethra. U.S. Dep't of Health & Human Servs., *Cystoscopy & Ureteroscopy*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases (June 2015), https://www.niddk.nih.gov/health-information/diagnostic-tests/cystoscopy-ureteroscopy.

[6] Botox treatment involves the injection of botulinum toxin into the bladder to "cause[] relaxation of the bladder muscle, helping with urgency and allowing the bladder to store more urine." [Filing No. 17-4 at 79.]

incontinence): urge incontinence[7] and stress incontinence.[8] [Filing No. 17-4 at 43.] Ms. Garner reported that the Vesicare and other medications that she had been prescribed before her operation did not improve her symptoms. [Filing No. 17-4 at 43-44.] Dr. Rao discussed InterStim sacral neuromodulation[9] as another treatment option going forward. [Filing No. 17-4 at 44.]

On September 6, 2016, Dr. Rao performed a cystourethroscopy and intravesical injection of 100 units of Botox "at 10 locations above the bladder trigone and then the sidewalls." [Filing 17-7 at 53.] Dr. Rao noted no "abnormalities" and stated that Ms. Garner "tolerated the procedure(s) and anesthesia well without complication." [Filing No. 17-7 at 53.]

On September 21, 2016, Ms. Garner saw Dr. Rao, and reported that the Botox did not improve her incontinence. [Filing No. 17-5 at 146.] Ms. Garner likewise reported "little improvement" with Myrbetriq, which she had recently been prescribed. [Filing No. 17-5 at 146.] Dr. Rao diagnosed Ms. Garner with "mixed incontinence, refractory overactive bladder, stress incontinence and intrinsic sphincter deficiency" and discussed her diminished bladder capacity and "worsening incontinence symptoms." [Filing No. 17-5 at 147.] Dr. Rao again discussed the possibility of InterStim sacral neuromodulation as a treatment option and discussed increasing Botox injections to 200 units. [Filing No. 17-5 at 147.] Dr. Rao scheduled Ms. Garner for repeat

---

[7] Urge incontinence occurs when urine leaks after one experiences a "strong, sudden need to urinate" followed by a bladder spasm. This happens when the "bladder muscles squeeze, or contract, at the wrong times." U.S. Nat'l Library of Med., *Urge Incontinence*, MedlinePlus (Aug. 31, 2015), https://medlineplus.gov/ency/article/001270.htm.

[8] Stress incontinence occurs when the "bladder leaks urine during physical activity or exertion," such as when one "cough[s], lift[s] something heavy, change[s] positions, or exercise[s]." U.S. Nat'l Library of Med., *Stress Urinary Incontinence*, MedlinePlus (March 28, 2016), https://medlineplus.gov/ency/article/000891.htm.

[9] Sacral neuromodulation involves "implanting a nerve stimulator" to "directly stimulat[e] the nerves that control . . . bladder function." [Filing No. 17-4 at 79.]

urodynamics testing the next day and for a follow-up to discuss further treatment options. [Filing No. 17-5 at 147.]

On September 29, 2016, Ms. Garner saw Dr. Rao for a follow-up appointment after her September 22 urodynamics testing. [Filing No. 17-4 at 14-16.] Dr. Rao noted that the testing showed similar findings to earlier testing and diagnosed Ms. Garder with "severe detrusor overactivity with small bladder capacity," "stress urinary incontinence," and "borderline intrinsic sphincter deficiency." [Filing No. 17-4 at 15-16.] Dr. Rao stated that "[Ms. Garner] did not respond well to her first dose of Botox" and discussed performing additional injections with 200 units. [Filing No. 17-4 at 16.] Dr. Rao planned to schedule additional Coaptite injections to treat the stress urinary incontinence and again discussed the possibility of InterStim sacral neuromodulation in the future. [Filing No. 17-4 at 16.]

On October 10, 2016, Ms. Garner saw her primary care physician, Dr. Michael LaRosa. Dr. LaRosa noted Ms. Garner's history with "profound, incessant urinary incontinence." [Filing No. 17-5 at 135.] Dr. LaRosa noted the scheduled Botox surgery but observed that Ms. Garner "may need further corrective surgery." [Filing No. 17-5 at 138.]

On October 18, 2016, Dr. Rao injected Ms. Garner with 200 units of Botox and three Coaptite injections, and performed a cystourethroscopy. [Filing No. 17-7 at 46.] Dr. Rao left in a "14-French [gauge] Foley catheter . . . to bag drainage." [Filing No. 17-7 at 46.] Dr. Rao noted that Ms. Garner "tolerated the procedure(s) and anesthesia well without complication." [Filing No. 17-7 at 46.]

On October 21, 2016, three days after the procedure, Ms. Garner visited the emergency room with bladder spasms and blood in her urine. [Filing No. 17-6 at 25; Filing No. 17-4 at 6.] A CT scan revealed "a Foley catheter within a collapsed bladder. Multiple calcifications along the

course of the urethra." [Filing No. 17-6 at 76.] The treatment notes stated that the "[b]iggest issue was some sediment catheter backup." [Filing No. 17-6 at 29.] Ms. Garner was trained on how to flush the catheter, given a home kit for flushing, and discharged. [Filing No. 17-6 at 29.]

In November 2016, Ms. Garner attempted to return to work, but was unable to perform her job duties due to her incontinence. [Filing No. 17-10 at 28-29.] In a subsequent correspondence with Aetna, Ms. Garner described her attempt to return to work:

> Prior to me returning to work on November 14, 15 and 16, Dr. LaRosa wrote me a script to give to H.R. so that I may go to the bathroom due to post-op complications as needed. It was disastrous. I had to put pads in my pockets. As soon as I felt I had to go to the restroom, I couldn't go. When I walked out of the restroom, I would start peeing. It hasn't changed. I would shut my gun down, go H.R., through security to my locker, to a restroom so I could change my underwear and clothes several times a day and put the dirty ones in my locker. I brought spare clothes every day to put in my locker. Amazon's restrooms are 6 minutes away average. I was on camera every moment. I ended up spending ½ the day doing this.

[Filing No. 17-4 at 71.] On November 17, 2016, Dr. Michael LaRosa, Ms. Garner's primary care physician, placed Ms. Garner off work. [Filing No. 17-10 at 28-29.] On November 18, 2016, Dr. LaRosa stated that he would "keep her off work until February, but she may need more time." [Filing No. 17-5 at 128.] Dr. LaRosa stated that Ms. Garner "remains unable to walk, cough, sneeze, bend over, etc, without profound urinary incontinence and pelvic pain. She tried to go back to work, but couldn't tolerate it." [Filing No. 17-5 at 128.]

On December 1, 2016, Ms. Garner returned to Dr. Rao complaining of significantly worsening symptoms:

> She reports significantly worsening leakage with urgency and accidents. She says she will just be sitting and crocheting and she will have sudden leakage. She has leakage with intercourse, this was present preoperatively as well. She reports wearing 14 pads per day and says she is unable to go anywhere because of the leakage. She has leakage iwth cough, laugh and sneeze. She has urgency and episodes of urge incontinence. She is quite frustrated with her bladder symptomatology and it has not improved at all. She is currently taking oxybutyinin given to her by her pcp. She has been on vesicare and myrbetriq in the past.

[Filing No. 17-4 at 36.] Dr. Rao noted that the surgery did not yield abnormal findings, the cystoscopies were normal, and urodynamic testing produced results "consistent with her preoperative urodynamics." [Filing No. 17-4 at 38.] Dr. Rao also noted that Ms. Garner's

overactive bladder did not improve following the 100 and 200 unit injections of intravesical Botox and that her stress incontinence and borderline intrinsic sphincter deficiency did not improve following transurethral coaptite injections. [Filing No. 17-4 at 38.] Dr. Rao reiterated that Ms. Garner "may be a candidate for interstim." [Filing No. 17-4 at 38.] Dr. Rao referred Ms. Garner to Dr. Kathryn Copeland, a urogynecologist and partner of Dr. Rao's, for a further opinion. [Filing No. 17-4 at 38.] Ms. Garner did not return to Dr. Rao after her December 1 appointment.

On December 6, 2016, Ms. Garner saw Dr. LaRosa for a checkup. [Filing No. 17-5 at 123.] Dr. LaRosa noted that Ms. Garner "continues to struggle, very small bladder, worsened urinary incontinence and bladder spasms. Frustrated with her urologist . . . still unable to walk without incontinence, etc." [Filing No. 17-5 at 123.] Dr. LaRosa "believe[d Ms. Garner] needs a 3rd opinion, URO/GYN, ongoing pelvic pain and severe incontinence after recent pelvic surgery." [Filing No. 17-5 at 123.] Dr. LaRosa stated: "No work scheduled before 2-1-17, but this will need re-eval." [Filing No. 17-5 at 123.]

On December 8, 2016, Ms. Garner visited Dr. Copeland for another opinion on her conditions. [Filing No. 17-4 at 9.] Dr. Copeland's notes state that Ms. Garner was "very angry" about her condition post-prolapse surgery and "described in detail [h]ow embarrassing her leakage of urine is." [Filing No. 17-4 at 9.] Dr. Copeland believed that the prolapse surgery did not cause Ms. Garner's incontinence and that, "based on her chart[,] it looks like she has had significant detrusor overactivity for years." [Filing No. 17-4 at 10.] Dr. Copeland stated that Ms. Garner had a "very severe form of detrusor overactivity/overactive bladder that will be difficult to treat." [Filing No. 17-4 at 10.] Dr. Copeland discussed the possibility of InterStim treatment, though stated that Ms. Garner was not interested in the procedure. [Filing No. 17-4 at 10.] Dr. Copeland

recommended that Ms. Garner either return for further treatment or get a referral to another urogynecologist. [Filing No. 17-4 at 12.] Ms. Garner did not return to Dr. Copeland.

Ms. Garner received a referral to urogynecologist Dr. Douglass Hale. On January 3, 2017, Ms. Garner visited Dr. Hale complaining of worsening incontinence, as shown in Dr. Hale's notes:

> The patient is a 57 year old Caucasian/White female, who is a consultation from Michael S. Larosa MD, for the evaluation of mixed incontinence. The patient notes that the urge component is more bothersome. The timing of the incontinence is reported as worse throughout day and night The patient does not associate the onset of symptoms with any event. She has noted these symptoms for 6 years. The symptoms are getting worse. She reports leaking more than splashes of urine (3 pts) daily (4pts) resulting in an incontinence severity index of 12. The patient uses 4 pads a day. The following aggravating factors are noted transferring to standing position, walking upstairs, change in position, and running water. There are no alleviating factors noted. She also reports pelvic pain. She denies an intermittent stream. Her past medical history is significant for a previous continence surgery and prior urogynecologic surgery for prolapse.

[Filing No. 17-10 at 91.] Dr. Hale next summarized Ms. Garner's medical history, including the discussions regarding InterStim treatment. [Filing No. 17-10 at 91.] Dr. Hale noted that Ms. Garner showed improvement with Oxybutynin and increased her dosage. [Filing No. 17-40 at 95.] Dr. Hale also prescribed estrogen cream to "treat urogenital atrophic skin changes" and advised Ms. Garner to increase her fiber and water intake to counteract side effects from the Oxybutynin. [Filing No. 17-10 at 95.]

On January 16, 2017, Ms. Garner saw Dr. Hale for urodynamic testing. [Filing No. 17-10 at 88.] Following testing, Dr. Hale noted "probable ISD [intrinsic sphincter disorder] (could not fill to 300 to check again) with Valsalva[10] voiding and trabeculation and irritation [of the bladder] on cystoscopy." [Filing No. 17-10 at 88.] Ms. Garner "ha[d] large leak with minimal Valsalva that stopped immediately after Valsalva." [Filing No. 17-10 at 89.] Ms. Garner was instructed to return with a bladder log to "try and differentiate which type of leakage is happening more often. We will review these and make our treatment decisions." [Filing No. 17-10 at 89.]

---

[10] The Valsalva maneuver involves closing the nostrils and mouth while "gently forc[ing] air into the back of [the] nose," as if one were blowing one's nose. Mayo Clinic, *Airplane Ear* (Apr. 27, 2016), https://www.mayoclinic.org/diseases-conditions/airplane-ear/diagnosis-treatment/drc-20351707.

## C. Physician Opinions Considered in Aetna's Initial Decision

Between August 9, 2016 and the date of Aetna's initial decision dated January 24, 2017, Dr. LaRosa submitted several attending physician and limitation worksheets reflecting his opinion that Ms. Garner could not work. The first physician statement, dated August 9, 2016, stated that Ms. Garner was unable to work due to "post-surgical complications" and contained a notation stating "Hopefully Back By 10-25-16." [Filing No. 17-9 at 134.]

Dr. LaRosa's November 18, 2016 physician statement again stated that Ms. Garner was totally impaired from working. [Filing No. 17-10 at 28-30.] Dr. LaRosa stated that Ms. Garner would "need further surgery" and noted the following symptoms and findings:



[Filing No. 17-10 at 29.] Dr. LaRosa noted that Ms. Garner's November 2016 attempt to return to work "did not go well. Unable to stand/bend, etc." [Filing No. 17-10 at 28.] In response to the inquiry as to when Ms. Garner may reach "maximum medical improvement," Dr. LaRosa wrote "Unknown, perhaps 2-18-17." [Filing No. 17-10 at 30.]

Dr. LaRosa's December 12, 2016 physician statement again stated that Ms. Garner was totally impaired from working due to "failed operation uro/Gyn Surgery." [Filing No. 17-10 at 48.] Dr. LaRosa answered that Ms. Garner would "reach maximum medical improvement" by "3-1-17 – will need re-ev[aluation]" and noted that Ms Garner could "possibly" require permanent work restrictions. [Filing No. 17-10 at 48.]

On December 27, 2016, Dr. LaRosa completed a capabilities and limitations worksheet. [Filing No. 17-7 at 8.] Dr. LaRosa opined that Ms. Garner was fully restricted in every functional category except use of hands, with which she had 25 percent usage capacity. [Filing No. 17-7 at 8-9.] Dr. LaRosa stated as follows:



[Filing No. 17-7 at 9.]

Dr. LaRosa completed another physician statement on January 16, 2017, again opining that Ms. Garner was unable to work. [Filing No. 17-6 at 20.] Dr. LaRosa made the following notations:

[Filing No. 17-6 at 20.] Dr. LaRosa wrote that it was "unknown" when Ms. Garner was "likely to have a full recovery" and "expect[ed] to see some improvement in the patient's ability to function" by "Jan – 2018 – but will need re-eval[uation]." [Filing No. 17-6 at 20.]

Dr. Rao completed a capabilities and limitations worksheet on December 27, 2016. [Filing No. 17-8 at 10-11.] Dr. Rao opined that Ms. Garner had no functional restrictions and could work more than 40 hours per week. [Filing No. 17-8 at 10-11.]

**D. Nurse Review & Aetna's Initial Decision**

On January 17, 2017, Aetna referred Ms. Garner's claim to Holly Shepler, a registered nurse, to complete an initial review. [Filing No. 17-3 at 2.] Aetna's claim referral notes provided as follows:

> EE is a 50 year old female out of work from her own medium level occupation as FC Associate I since 07/25/16. EE is diagnosed with urinary incontinence and pelvic floor prolapse (See 01/16/17 APS signed by Dr. Michael LaRosa in Image# 22102561). EE initially went out of work for a hysterectomy but has since failed conservative and surgical interventions.
>
> EE failed surgical intervention, botox injections with cystourethroscopy, and trans urthral coaptite injections on 07/25/16 (Op Note in Image 21963826 on pages 5-7), 09/06/16 (Op Note in Image 21963826 on page 43), & 10/18/16 (Op Note in Image 21963826 on page 44).
>
> EE is has use of her hands for up to 20% of her shift; she is fully restricted from performing all other activities (See 12/27/16 CLW signed by Dr. Michael S. LaRosa in Image# 22071216).
>
> Per medical guidelines, the expected recovery period for med occ employees undergoing surgical treatment for urinary incontinence is from 70 - 91 days. However, EE has failed to recover in the expected normal recovery period as described above.

[Filing No. 17-3 at 5.]

Nurse Shepler completed her review on January 23, 2017. [Filing No. 17-3 at 11.] Nurse Shepler reviewed medical records submitted by Ms. Garner, providing brief summaries of most of the findings. [Filing No. 17-3 at 12-13.] Nurse Shepler provided longer summaries of records from a December 1 visit with Dr. Rao and a December 9 visit with Dr. Copeland as follows:

> 12/1/16 OV Dr. Rao: The claimant is now also status post inradetrusor botox injection and transurethral coaptite injection on 10/18/16. She was evaluated in ED post-operatively for bladder spasms. She reports significantly worsening leakage with urgency and accidents. She reports leakage while sitting to crochet and with intercourse. It is noted this was present pre-operatively as well. She reports earing 14 pads per day and unable to go anywhere due to leakage. She is distraught and crying, noting her paperwork was filled out incorrectly and she is not getting paid, her husband has yelled at her several times. Assessment ofr refractory overactive bladder and intrinsic sphincter deficiency. Treatment options discussed, encouraged for 3rd opinion. The provider advised the claimant the surgery was uncomplicated with no abnormal findings and subsequent cystoscopy x2 have been normal and urodynamic testing results are consistent with her pre-operative urodynmics showing severe detrusor overactive bladder and small bladder capacity.
> 12/8/16 OV Dr. Copeland, urology: discussion of history of condition and treatment options. Claimant is noted to be angry. She is not interested in nerve modulation, stating it would be embarrassing to go through security with this. Dr. Copeland stated that due to the claimant¿s anger, unsure if the claimant felt comfortable with provider and encouraged the claimant if that is the case, to see another provider outside of this practice with Dr. Rao/Copeland.

[Filing No. 17-3 at 12.]

At the end of her review, Nurse Shepler concluded that Ms. Garner was not impaired. [Filing No. 17-3 at 14.] Her conclusions were reflected in Aetna's January 24, 2017 letter rejecting Ms. Garner's disability claim. [*See* Filing No. 17-1 at 133.] The letter first reiterated the various

Plan provisions governing Ms. Garner's claim, set forth various documents that Aetna had asked

for as part of the review, and then stated as follows:

> We understand that you ceased work due to urinary incontinence. After a thorough review of the medical information contained in your file, we have found that the evidence does not support that your symptoms are of the severity to preclude you from performing the material duties of your own occupation as FC Associate I on a full time basis on or after the LTD benefits effective date of 01/21/2017. Therefore, your claim for LTD benefits has been denied. Our reason for this decision is as follows.

[[Filing No. 17-1 at 132](#).] The letter then set forth its reasons for rejection as follows, paraphrasing

Nurse Shepler's findings in the blocked-quoted paragraphs:

> In order to assess your disabling condition(s) and severity of symptom(s), we requested your medical records from your physician(s), IU Health West Medical Center, Dr. Keating, St. Vincent Hospital, Dr. Michael LaRosa, Naab Road Surgery Center, Dr. Kathryn Copeland, Dr. Sameena Rao (Ronald Reagan Pkwy Location), Dr. Sameena Rao (Naab Road Location), Urology of Indiana, Dr. Douglass Hale, and Whitson Vision. We have received medical records from IU Health West Medical Center, St. Vincent Hospital, Naab Road Surgery Center, Dr. Kathryn Copeland, Dr. Sameena Rao (Ronald Reagan Pkwy Location) and Whitson Vision. Then we had an Aetna medical consultant review your entire file. The following text is based on our review of your medical information in your file.
>
>> There is a lack of medical evidence to support your impairment to general activity or specific tasks. You are out of work due to hysterectomy and colpopexy done in July 2016. You have a history of bladder symptoms dating back to 2013. Post-operative diagnostics indicate ongoing overactive bladder and diminished bladder capacity. Your medical providers indicate this was present prior to your hysterectomy and prolapse repair.
>>
>> You report the inability to work due to stress incontinence. Dr. Sameena Rao, surgeon and urogynecology, completed a Capabilities and Limitations Worksheet indicating there are no restrictions prescribed. While you may continue to treat for your chronic medical conditions, your primary care provider (Dr. Michael S. LaRosa) has provided restrictions which appear to be based on your subjective reports of symtpoms, which is insufficient medical evidence to support impairment.
>>
>> It is noted you did undergo some further testing and will see a new urogynecologist (Dr. Douglass Hale) for a third opinion in February 2017. It is also noted you are treating with a chiropractor (Dr. James Keating) and participated in physical therapy for back pain. There were no physical therapy medical records submitted for review. The chiropractor submitted a Capabilities and Limitations Worksheet with no restrictions, and reported you self-reported the inability to work due to your urinary symptoms. There are no restrictions prescribed as part of the chiropractor's plan of care. You are noted to have some age related vision changes with no restrictions indicated as part of the plan of care.
>>
>> Medical guidelines supports the normal recovery period for medium occupation employees undergoing a laparoscopic abdominal hysterectomy from 42 to 56 days (or from 07/25/2016 through 09/18/2016). Medical guidelines also supports the normal recovery period for medium occupation employees undergoing a surgical treatment for incontinence is from 70 to 91 days (or from 09/06/2016 through 12/05/2016 and again from 10/18/2016 through 01/16/2017).
>
> While it is always possible that you may be demonstrating some objective impairment, which is more significant than what is evident at the present time, the information currently available fails to reveal evidence of physical or cognitive impairment so significant that you would be considered unable to perform your own occupation on a full time basis as FC Associate I. Therefore, your claim for LTD benefits has been denied.

[Filing No. 17-1 at 133.]

**E. Medical Treatment & Opinions Prior to Appeal**

On January 30, 2017, Ms. Garner returned to Dr. Hale for a "preoperative consultation" for "Stage 1 interstim" and fluoroscopic surgery. [Filing No. 17-10 at 83.] Dr. Hale noted that Ms. Garner's symptoms had not changed since her last visit and that "her bladder diaries reveal an average of 10 leaks per day, an average of 15 voids per day, and average of 1 voids per night, and an average voided volume of 80 cc." [Filing No. 17-10 at 83.] Based upon her diaries, Dr. Hale concluded that the overactive bladder was the most serious condition, and wrote: "We will proceed with Interstim." [Filing No. 17-10 at 86.] Dr. Hale gave the following assessment of Ms. Garner's incontinence:

P1 - Mixed urinary incontinence - the patient understands her case is complicated. She was noted to have detrusor overactivity and stress urinary incontinence. She has multiple surgeries for incontinence including coaptite urethral injections and Botox bladder injections. She has tried Vesicare/Myrbetriq/Oxybutynin with no improvement in symptoms. She would like a Stage 1 placement of Interstim Neuromodulation. She understands if she sees no improvement the next would, again, be Botox intradetrusor injections. If still no improvement, at that time a mid-urethral sling will be considered for stress urinary incontinence. The patient voiced understanding.

[Filng No. 17-10 at 86.]

On January 31, 2018, Dr. LaRosa completed another physician statement and capabilities and limitations worksheet, each opining that Ms. Garner was unable to work. [Filing No. 17-5 at 97-101.] Dr. LaRosa noted that Ms. Garner "[h]as failed all operative procedures and Botox injections." [Filing No. 17-5 at 97.] Dr. LaRosa also noted that Ms. Garner would "need upcoming implantable neuro modulation" surgery. [Filing No. 17-5 at 98.] Dr. LaRosa stated that there would be "no need" for vocational rehabilitation because "[s]urgery is [the] only treatment" and that, in his opinion, Ms. Garner was motivated to return to work. [Filing No. 17-5 at 98.] Dr. LaRosa concluded that Ms. Garner was fully restricted, had "surgery pending," and would be unable to return to work until March 4, 2017 at the earliest. [Filing No. 17-5 at 100-101.] Dr.

LaRosa stated that Ms. Garner would "need re-ev[aluation]" at that time and listed May 4, 2017 as a possible return date.  [Filing No. 17-5 at 100.]

### F. Nurse Follow-up Review

On January 27, 2017, Aetna referred Ms. Garner's claim to Nurse Shepler for a second review based upon several updated medical records.  [Filing No. 17-3 at 32.]  Nurse Shepler completed her second review on February 2, 2017.  In addition to earlier records, the review file includes treament notes and worksheets from Dr. LaRosa dated January 31, 2017.  [Filing No. 17-3 at 53.]  Nurse Shepler sumarized Dr. LaRosa's January 31 treatment notes as follows:

> 1/31/17 OV Dr. LaRosa: the claimant was evaluated by uro/gyn and will have implantable sacral neuro-modulator at this point. On exam she is anxious, tender suprapubic region, difficulty standing from chair. Assessment for stress incontinence, pelvic and perineal pain, dysuria.

[Filing No. 17-3 at 53.]  It appears that Nurse Shepler did not have access to Dr. Hale's January 31, 2017 treatment notes.  [*See* Filing No. 17-3 at 49-53.]

Nurse Shepler reaffirmed her previous conclusion that Ms. Garner was not disabled under the Plan, explaining in part as follows:

> **There is a lack of medical evidence to support impairment to general activity or specific tasks. The claimant ceased work due to hysterectomy and colpopexy in July 2016. The claimant has a history of bladder symptoms dating back to 2013, at which time she was working. Post-operative diagnostics indicate ongoing overactive bladder and diminished bladder capacity, similar to her pre-operative state, however, of note, with slight increase in bladder capacity than shown on pre-operative testing. Providers indicate this condition was present prior to her hysterectomy and prolapse repair. The claimant reports inability to work due to stress incontinence. The surgeon completed a CLW indicating there are no restrictions prescribed. The 2nd opinion urologist agreed. While the claimant may continue to treat for her chronic medical condition, and the primary care provider has provided restrictions which appear to be based on subjective reports of symptoms, there is insufficient medical evidence to support impairment. It is noted the claimant did undergo some further testing with a new uro/gyn specialist, Dr. Hale and conservative measures were prescribed.  TPC by this clinician to Dr. Hale confirmed that the claimant was advised to proceed with neuro modulator implant; however, she has lost her insurance. While restrictions at the time of the procedure and a brief post op period may be indicated, the medical evidence does not support current restrictions. There is no evidence of skin irritation or breakdown from incontinence. There are no new diagnostics or exam findings to suggest impairment related to her diagnosis of urge/stress incontinence. Multiple uro/gyn specialists have been consulted with no ongoing restrictions prescribed. As they are the specialists for this condition, greater weight is given to their assessments over that by the primary care provider.

[Filing No. 17-3 at 62.]

### G. Appeal & Doctor Review

On January 31, 2017, Ms. Garner appealed the denial of her claim. [Filing No. 17-5 at 71.]

On February 24, 2017, Aetna retained Dr. Stuart Fine, urologist and associate clinical professor at

Medical College of Wisconsin, to complete a peer review of Ms. Garner's treatment records.

[Filing No. 17-4 at 83-87.] Dr. Fine completed his review on March 6, 2017. [Filing No. 17-4 at

83-87.] The review began with the following "Claim Synopsis":

> 57 year old FC Associate who is claiming disability as of 07/25/2016 due to hysterectomy and
> colpopexy in July 2016. She is status post intravesical botox, cystoscopy on 9/6/16 by Dr. Rao and
> intravesical botox with transurethral coaptite injections and cystoscopy on 10/18/16 by Dr. Rao. She
> has 2 types of urinary leakage, stress incontinence and detrusor instability. Treating one will not help
> the other. She has had multiple surgeries for incontinence including coaptite urethral injections and
> Botox bladder injections. EE is scheduled for placement of Interstim Neuromodulation.

[Filing No. 17-4 at 84.]

Following this synopsis is Dr. Fine's summary of Ms. Garner's records, stating: "All the

records were reviewed in their entirety. I will summarize those portions of the records received

that have relevance to the questions and timeframe identified for this review and within the scope

of my area of Urology specialty." [Filing No. 17-4 at 84.] Dr. Fine first summarized Dr. Rao's

treatment:

> This claimant is a female individual who sought consultation for a vaginal prolapse with Urology of
> Indiana, and specifically saw Dr. Sameena J. Rao. Dr. Rao is a urologist practicing in the
> Indianapolis Area.
>
> This claimant was seen in consultation by Dr. Rao on 02/25/2016. Basically her complaint was the
> feeling that "something is falling out," and urinary stress incontinence associated with coughing,
> laughing, sneezing. A comprehensive consultation took place at that time with Dr. Rao, discussing
> surgical procedure for repair of the vaginal prolapse, as well as the issue of the urinary stress
> incontinence. Recommendation was that she undergo an evaluation including cystoscopy and
> address the definitive recommendations based upon these findings. It is mentioned in that
> consultation claimant also complained of urinary urgency and she was informed that surgical
> procedure would not improve this symptom and, in fact, any type of vaginal sling may increase her
> bladder over activity, however, he proceeded with a complete evaluation.

[Filing No. 17-4 at 84.]

On 03/29/2016 the claimant underwent evaluation including cystoscopy and urodynamic studies. The outcome indicated the claimant had a small bladder capacity and at that time no urinary stress incontinence could be elicited. Following that evaluation, a discussion took place between the claimant and her husband and mother, discussing treatment options, and surgery was scheduled for 07/25/2016, and the claimant was specifically told that a vaginal sling procedure was not appropriate due to the fact that she has a small bladder.

The surgical procedure was performed in July 2016, and the procedure performed was a supracervical hysterectomy, colpopexy, and cystoscopy. In the postoperative period the claimant continued to complain of urinary urgency. The claimant was seen a number of times with this complaint and based upon the complaint, the claimant was offered intravesical Botox treatment for overactive bladder. There was no evidence of interstitial cystitis.

Over a period of time, the claimant received a number of Botox injections within the bladder for detrusor overactivity, and the claimant continued to complain of urinary urgency and frequency with minimal improvement. During the course of the care by Dr. Rao, the claimant was seen a number of times to review and discuss her symptoms, and apparently the claimant was very frustrated with the persistent urinary frequency and was also adamant that she should have undergone a sling procedure which, based upon all of the evaluations, was totally contraindicated and was not performed.

[Filing No. 17-4 at 85.]

      Dr. Fine next discussed Dr. Hale's treatment:

After seeing a number of other physicians, the claimant was referred to Dr. Douglas Hale, who is a urogynecologist practicing in the Indianapolis Area. Dr. Hale is an extraordinarily well-qualified and well-trained urogynecologist with vast experience with urogynecologic problems. Dr. Hale saw this claimant several times, and based upon his evaluation he unequivocally supported the previous surgery performed by Dr. Rao, and felt the claimant's urinary frequency and urgency was related to an overactive detrusor, which existed prior to her surgical procedure, and that there was no indication that she should have had a vaginal sling. Dr. Hale only saw the claimant on several occasions, and in fact was the last consultant to see this individual, and based upon his expertise did not feel that any additional studies were necessary and supported her previous treatment. At this point in time the claimant's complaint of urinary frequency appeared to be relatively modest and in no way was disabling to the point that a disability could be ascribed to it.

As part of this report I will add information about the excellent qualifications of Dr. Hale, based upon information obtained in the review of this case.

Basically, this concludes this review of this 57-year-old lady who had undergone a laparoscopic repair of a vaginal prolapse, continued to complain of urinary frequency and in spite of being seen by a number of different physicians and provided the appropriate state-of-treatment continued to complain of chronic urinary urgency and frequency. There were no objective findings that required any further diagnostic studies, and her last visit with a urogynecologist, Dr. Douglas Hale, on 01/03/2017 in consultation after being referred by Dr. Michael S. Larosa. Dr. Hale is a urogynecologist associated with Urogynecology Associates in Indianapolis, Indiana. At that visit Dr. Hale reviewed all the claimant's symptoms and there is a comprehensive consultation, and as part of this consultation Dr. Hale felt the previous treatment was appropriate, and that reevaluation was available which include urodynamic testing and cystoscopy. However, the results of this consultation indicated that no interventional surgical procedures were recommended and attention be directed at estrogen-deficiency changes of the vaginal area as well as treatment of chronic constipation.

[Filing No. 17-4 at 86.]  Dr. Fine also reported that he conducted a "peer-to-peer consultation"

with Dr. Hale:

Dr. Douglas Hale, Urogynecologist, was contacted on 03/03/2017 at 2:25 p.m. Dr. Hale was able to provide me with his impression of the status of this claimant, his extensive review of the previous history including the surgical procedures, and Dr. Hale supported the previous treatments and felt that this individual has a hyperactive bladder which also can be referred to as hyperactive detrusor function in that while a variety of symptomatic therapies are available, this claimant apparently has a strong feeling that she should have had a sling procedure, which is noted to be contraindicated, and he also stated that she is not in any way incapacitated or debilitated by her symptoms, and has no disability associated with her symptoms. This concluded my discussion with Dr. Hale.

[Filing No. 17-4 at 86.]

Dr. Fine concluded that Ms. Garner "has a well-documented case of vesical hypertonia and an unstable detrusor. This is a chronic condition and will not result in any significant long-term morbidity." [Filing No. 17-4 at 86.]

On March 13, 2017, Aetna denied Ms. Garner's appeal. [Filing No. 17-2 at 4-5.] The decision stated that "[w]e reviewed your entire claim file, including all medical records, attending physician statements, and your appeal letter. We also had your file reviewed by an independent peer physician who specializes in Urology." [Filing No. 17-2 at 4.] Aetna then summarized Dr. Fine's review, paraphrasing from his analysis excerpted above. [Filing No. 17-2 at 4-5.] The decision concluded: "Since there is no clinical evidence of a functional impairment that would preclude you from performing the material duties of your own occupation, the decision to deny benefits is upheld." [Filing No. 17-2 at 5.]

### H. Documents Submitted After Appeal

On March 15, 2017, Ms. Garner corresponded with Aetna expressing her disagreement with Aetna's decision. [Filing No. 17-4 at 55.][11] In particular, Ms. Garner challenged Dr. Fine's account of his conversation with Dr. Hale. [Filing No. 17-4 at 55.] Ms. Garner stated that she spoke both with Dr. Hale's office manager and with Dr. Hale and confirmed that Dr. Hale does not "do disability at that office. . . . [Dr. Hale] doesn't like to deal with disability and acknowledged that since Dr. LaRosa (my primary) started my disability he should continue." [Filing No. 17-4 at 55.]

On April 7, 2017, Ms. Garner saw Dr. LaRosa complaining of a variety of issues. [Filing No. 17-3 at 136.] Dr. LaRosa noted the following:

> She is distraught, and aggravated. She recently was turned down for disability longterm, thru Aetna, and is having communication problems with her employer regarding time off , etc. She continues to have profound urinary incontinence. She is unable to return to work at this time, and can only go 15-20 minutes before having urinary incontinence episodes, and at times urinary accidents. Continues to have pelvic pain, abdominal discomfort, profound bladder cramps. Dr Hale's office, urogynecology, has not been helpful when it comes to her disability situation. Anxiety is at all time high, and her fibromyalgia is much worse. She is still contemplating an implantable bladder neuromodulator for her severe incontinence, because everything else has failed to improve her symptoms. Chronic diarrhea now more of a challenge.

---

[11] Aetna argues that the Court should not consider Ms. Garner's correspondence submitted after Aetna's appeal decision, which was a "'final decision' and thus outside of the AR." [Filing No. 25 at 17.] First, that statement is inaccurate: Ms. Garner's correspondence is, in fact, a part of the administrative record submitted by Aetna. Second, Aetna cites no authority for the proposition that the Court may not consider record evidence submitted after the appeal, particularly where the new evidence may undermine part of the administrator's earlier decision. Undeveloped arguments are waived. *United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016). Finally, despite its citation to a letter stating that "no other action will be taken by Aetna," [Filing No. 17-2 at 6], Aetna did in fact take further action, requesting Dr. Fine's May 2017 addendum, which was also included in the administrative record. [Filing No. 17-3 at 131-35.] Aetna cannot have it both ways, relying upon evidence it generated after appeal while asking the Court to ignore evidence Ms. Garner submitted during the same time period.

[Filing No. 17-3 at 136.]  Dr. LaRosa stated that Ms. Garner "can't lift things without having urinary accidents, and continues to have bladder spasms."  [Filing No. 17-3 at 137.]

On April 18, 2017, Ms. Garner saw Dr. LaRosa with similar complaints.  [Filing No. 17-3 at 139.]  Dr. LaRosa noted the following:

> She is still battling her disability carrier. She claims that her employer may have terminated her, due to her absences related to her postoperative complications from her pelvic surgery. She is still contemplating getting an implantable neuro modulator for her severe urinary incontinence. Her urinary incontinence remains disabling. UShe is frustrated with all of her urogynecology consults so far. She can only go about 20 minutes without having to go to the bathroom again, and is still having a lot of accidents and incontinence. She remains anxious. Increased constipation and abdominal pain is reported. Sinus pressure has been worse, her teeth and face hurt now.

[Filing No. 17-3 at 139.]  Dr. LaRosa sent his treatment notes from April 7 and April 18 to Aetna on April 28, 2017.  [Filing No. 17-3 at 135.]

### I. Dr. Fine Addendum

On May 5, 2017, Dr. Fine issued an addendum at Aetna's request.  [Filing 17-3 at 131-35.]

Dr. Fine wrote as follows:

In summary, this claimant is a 57-year-old female who has undergone an extensive evaluation by both urologist and urogynecologist for a complaint of urinary frequency and what is described as bladder cramps. She has been seen by Dr. Hale, who is an urogynecologist in the Indianapolis area and a discussion took place and this is in my original report. Apparently, there was a suggestion that she may be a candidate for an implantable bladder neuromodulator which I have seen described as an InterStim device for control of her symptoms. However, the urogynecologist who has seen the claimant in the past were not particularly supportive of any aggressive intervention, specifically the use of an InterStim device.

I have reviewed records from Dr. Michael S. Larosa, who is a physician in the Indianapolis area. I am not exactly sure if Dr. Larosa is an internist as he is not identified as such.

I also reviewed the records from Dr. James Keating, who is a chiropractor, practicing in Avon, Indiana, which I assume is close to the Indianapolis area.

In addition to the information provided in the notes from Dr. Larosa, there is also a letter dated 03/14/2017 from the claimant, discussing her desire to have a sacral neuromodulator implanted and one can assume, based upon the tone of the writer, that the claimant is having significant distress as she feels her symptoms are not being adequately addressed by the physicians who have seen her in the past.

Based on my previous review, which included the records provided to me, as well as a comprehensive discussion with the urogynecologist, Dr. David Hale, apparently it was his opinion that a surgical procedure, such as a vaginal sling, would be contraindicated and the issues related to other comorbid conditions were alluded to, which included constipation, pelvic pain and anxiety.

[Filing No. 17-3 at 132.]  Dr. Fine reached the following conclusion based upon his review:

> I have reviewed additional medical records, and I must rely upon the records provided to me from my original review and my opinion based upon the previous records and my discussion with Dr. Hale remains unchanged. I recognize that this claimant has a difficult problem and has not found an acceptable solution or resolution to her symptoms and my impression is that she should seek an additional consultation with an area of excellence that deals specifically with urogynecologic diseases and perhaps be referred out of the Indianapolis area to a center such as the Cleveland Clinic in Cleveland, Ohio.

[Filing No. 17-3 at 133.]  Thus, Dr. Fine reaffirmed his opinion that Ms. Garner's claim should

be denied.  [Filing No. 17-3 at 133.]

### J.  Procedural History

On April 25, 2017, Ms. Garner brought suit against Aetna, alleging that Aetna erroneously

denied her disability claim and seeking past benefits, future benefits, interest, and attorney's fees.

[Filing No. 1.]  On November 20, 2017, Aetna filed the administrative record in this matter, [Filing

No. 17], and both parties moved for summary judgment, [Filing No. 18; Filing No. 19].   The

parties' Motions are now fully briefed and ripe for determination.

### IV.
### DISCUSSION

The Court first addresses Ms. Garner's substantive arguments before addressing the issue

of remedy.

### A.  Reasonableness of Aetna's Decision

Ms. Garner argues that Aetna unreasonably denied her benefits based upon omissions and

misstatements in Dr. Fine's physician review.  Specifically, Ms. Garner argues that Dr. Fine falsely

stated that no further surgical intervention was recommended, failed to fully review Dr. Hale's

medical records, and arbitrarily rejected Dr. LaRosa's opinions without any discussion.[12] [Filing No. 20 at 17-22.]

In its briefing, Aetna argues that it reasonably relied upon Nurse Shepler's and Dr. Fine's reviews. [Filing No. 25 at 23-25.] Specifically, Aetna argues that Nurse Shepler reasonably rejected Dr. LaRosa's opinions and that Dr. Fine stated that he fully considered all relevant medical records. Aetna argues that its decision was further supported by Dr. Rao's and Dr. Hale's opinions. [Filing No. 25 at 25- 31.] Aetna argues that this evidence requires that its decision be affirmed under the deferential standard of review. [Filing No. 21 at 20-30; Filing No. 25 at 22-25; Filing No. 27 at 6-18.]

In her responsive briefing, Ms. Garner argues that Dr. Hale's offices does not give disability opinions, thus making Dr. Fine's statement to the contrary inaccurate. [Filing No. 24 at 10.] Ms. Garner points to evidence in the record showing that Ms. Garner sent correspondence to Aetna to that effect. [Filing No. 24 at 10.] Ms. Garner reiterates her arguments that Dr. Hale falsely stated that no further surgery was recommended and dismissed Dr. LaRosa's opinions without explanation. [Filing No. 26 at 10-12.]

ERISA "sets minimum standards for voluntarily established health and pension plans in private industry." *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1138 (7th Cir. 2017) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008)). Where, as here, a plan grants the administrator discretion in assessing a claimant's eligibility for benefits and construing the terms of the plan, the Court must review the administrator's denial of benefits under a deferential

---

[12] Ms. Garner additionally argues that Aetna's initial denial failed to adequately advise Ms. Garner of what additional information was required to perfect her claim. [Filing No. 20 at 23-24.] As explained below, the Court ultimately agrees with Ms. Garner that Aetna's denial was arbitrary and capricious, and therefore declines to address this additional argument.

"arbitrary and capricious" standard. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (citing *Glenn*, 554 U.S. at 111; *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009)). But this standard is "not a rubber stamp," *id.*, and does not "requir[e] a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits," *id.* at 766 n.5. Rather, courts review benefit denials for "procedural regularity, substantive merit, and faithful execution of fiduciary duties," *id.*, reversing the administrator's decision where the "plan's decision is unreasonable" in any of these areas, *Kennedy*, 856 F.3d at 1138.[13]

Procedurally, this means that "specific reasons for denial [must] be communicated to the claimant and . . . the claimant [must] be afforded an opportunity for full and fair review by the administrator." *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. No. 506*, 545 F.3d 555, 559 (7th Cir. 2008) (internal quotation omitted), *abrogated in part on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010), *and continued vitality recognized by Holmstrom*, 615 F.3d at 766 n.6. The administrator must "weigh the evidence for and against, and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review." *Halpin v. W.W. Granger, Inc.*, 962 F.2d 685, 695 (7th Cir. 1992) (internal quotation omitted); *Holmstrom*, 615 F.3d at 777 (reversing determination "based on selective readings" of the evidence); *see Black & Decker Disability Plan v. Nord*, 538

---

[13] The Court's analysis and conclusions would not be altered even if the Court were to use the "downright unreasonable" phraseology preferred by Aetna and sometimes evoked by the Seventh Circuit. *Cf. Kennedy*, 856 F.3d at 1138 ("[A] reviewing court will overturn a denial of benefits if the plan's decision is unreasonable."); *Holmstrom*, 615 F.3d at 766 n.5 (noting that the court has "sometimes described the arbitrary-and-capricious test as whether the administrator's decision was 'downright unreasonable'" and characterizing the phrase as "merely a shorthand expression for a vast body of law" and not a requirement that a plaintiff "show that only a person who had lost complete touch with reality would have denied benefits").

U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence . . . ."); *Tate*, 545 F.3d at 559 ("We will not uphold a termination when there is an absence of reasoning in the record to support it." (internal quotation omitted)). Substantively, the administrator's conclusions must be supported by "substantial evidence." *Holmstrom*, 615 F.3d at 775. The decision to deny benefits cannot be upheld where it relies upon "selective readings" of medical evidence that fail to account for "the entire picture" of the claimant's limitations. *Id.* at 777 (collecting cases and explaining that administrators may not base denials upon "cherry-picked" and "selectively considered" evidence).

The Court first addresses Ms. Garner's arguments regarding Aetna's treatment of Dr. Hale's records and Dr. LaRosa's opinions before addressing other issues raised by Aetna.

### 1. Dr. Hale

As set forth in great detail above, Aetna's appeal denial recited that Aetna "reviewed your entire claim file" and had Ms. Garner's "file reviewed by an independent peer physician." [Filing No. 17-2 at 4.] The remainder of Aetna's denial letter discusses the reasons given by Dr. Fine. [*See* Filing No. 17-2 at 4-5.] Dr. Fine, in turn, placed great importance on Dr. Hale's treatment decisions, observing that Dr. Hale is an "extraordinarily well-qualified and well-trained urogynecologist with vast experience" and "excellent qualifications." [Filing No. 17-4 at 85.] Dr. Fine then stated that "[t]here were no objective findings that required any further diagnostic testing" and that the "results of this consultation [with Dr. Hale] indicated that no interventional surgical procedures were recommended." [Filing No. 17-4 at 85.] Finally, Dr. Fine discussed the results of his "peer-to-peer consultation" with Dr. Hale wherein, according to Dr. Fine, he was informed that Ms. Garner "is not in any way incapacitated by her symptoms, and has no disability associated with her symptoms." [Filing No. 17-4 at 86.]

28

Dr. Fine's conclusions drawn from Dr. Hale's treatment primarily rest on two grounds: 1) that Dr. Hale did not think more surgery was needed, and 2) that Dr. Hale told Dr. Fine that Ms. Garner was not disabled.

The first of these conclusions fails the substantive reasonableness test because it completely lacks evidentiary support. Aetna does not meaningfully challenge Ms. Garner's argument on this point. As Dr. Hale's January 30, 2017 "preoperative consultation" treatment notes plainly state, [Filing No. 17-10 at 83]: "We will proceed with Interstim," [Filing No. 17-10 at 86]. Indeed, Dr. Hale set forth a comprehensive contingency plan involving future surgical intervention should Intersim not prove successful, first stating that more Botox would be in order and then, "[i]f still no improvement, at that time a mid-urethral sling would be considered." [Filing No. 17-10 at 86.] Thus, Dr. Fine's statement that "no interventional surgical procedures were recommended" by Dr. Hale not only lacks the support of substantial evidence—it is absolutely wrong.

As Ms. Garner points out, this substantively unreasonable conclusion evinces procedural unreasonableness as well. Despite stating that he reviewed all relevant records "in their entirety," including medical records from Dr. Hale through January 31, 2017, Dr. Fine stated that Ms. Garner's "last visit with a urogynecologist, Dr. Douglas Hale," occurred "on 01/03/2017." [Filing No. 17-4 at 85.] It appears that Dr. Fine failed to even consider Dr. Hale's January 16 urodynamic testing notes, which detailed a potentially significant "large leak with minimal Valsalva," and January 30 treatment notes, which detailed a plan of surgical intervention going forward. Dr. Fine's conclusion that Ms. Garner was not disabled based upon a lack of recommended surgical intervention lacks both substantial evidence and procedural regularity.

Dr. Fine's May 5, 2017 addendum does not alter the Court's conclusion because it, too, suffers from substantive errors. In his addendum, Dr. Fine states that "[a]pparently, there was a suggestion that she may be a candidate . . . [for InterStim]. However, the urogynecologist who has seen the claimant in the past were not particularly supportive of any aggressive intervention, specifically the use of an InterStim device." [Filing No. 17-3 at 132.] This characterization is likewise riddled with factual inaccuracies. There was more than a "suggestion" that Ms. Garner "may be a candidate" for InterStim—as Dr. Hale stated, "We will proceed with Interstim." And every urogynecologist to treat Ms. Garner brought up the possibility of InterStim, though electing to first attempt more conservative treatments. This includes, but is not limited to, discussions held at Ms. Garner's 2016 visits with Dr. Rao on August 18, September 21 and 29, and December 1; her December 8, 2016, visit with Dr. Copeland; and her preoperative consultation with Dr. Hale on January 30, 2017, following which Dr. Hale planned to perform the Stage 1 InterStim operation. Dr. Fine's observations again lack evidentiary support.

The Court cannot write off Dr. Fine's misstatements regarding InterStim treatment as trivial or harmless. First, the fact that Ms. Garner's specialists continued to discuss further surgical intervention corroborates Dr. LaRosa's observations and Ms. Garner's statements that her conditions were not improving. Ms. Garner has pointed to record evidence explaining that sacral nerve stimulation (InterStim) "is a treatment only offered by some specialists to people with *severe and persistent symptoms* which have failed to improve with other treatments." [Filing No. 17-4 at 79 (emphasis added).] And Dr. Fine found it significant, both in his initial peer review and his addendum, that procedures such as InterStim were not being seriously pursued. That conclusion was inaccurate, undermining a critical basis of Dr. Fine's—and Aetna's—decision. *Cf. Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) ("[P]rocedural reasonableness is the

cornerstone of the arbitrary-and-capricious inquiry. . . . By ignoring [the plaintiff's] key medical evidence, [the defendant] can hardly be said to have afforded her an opportunity for full and fair review . . . .").

Second, Dr. Fine's statements in his initial peer review regarding his conversation with Dr. Hale present additional procedural problems. Aetna's appeal denial letter specifically credited Dr. Fine's characterization of Dr. Hale's comments that Ms. Garner was not disabled at all because of her condition. But correspondence from Ms. Garner, included in the administrative record, constitutes evidence that Dr. Hale's comments were not as they seemed. [Filing No. 17-4 at 55.] To the contrary, if Ms. Garner's statements are credited (as they must be when considering Aetna's Motion for Summary Judgment), then Dr. Hale's comments were not addressing Ms. Garner's conditions at all but instead someone with hypothetical conditions. Moreover, Ms. Garner has given the Court further reason to doubt the accuracy of Dr. Fine's initial peer review due to his apparent failure to review Dr. Hale's treatment notes from January 16 and January 30, both of which suggested more aggressive treatment than did the initial January 3 consultation. Without any explanation or acknowledgment of the issues raised by Ms. Garner, Aetna fully credited Dr. Fine's statements regarding Dr. Hale. This decision was procedurally unreasonable.

### 2. Dr. LaRosa

Turning, then, to Aetna's consideration of Dr. LaRosa's opinions, the Court again agrees with Ms. Garner that Aetna's decision was procedurally inadequate. Aetna is not obliged to give any special weight to Dr. LaRosa as a treating physician. *See Nord*, 538 U.S. at 834. But Aetna is obliged to provide some minimal articulation for rejecting a claimant's favorable evidence. *See Halpin*, 962 F.2d at 695.

Dr. LaRosa treated and evaluated Ms. Garner regularly and consistently described her difficulties performing everyday tasks due to her incontinence. Dr. Fine's initial peer review, relied upon by Aetna in its denial decision, did not mention any of Dr. LaRosa's treatment records or medical opinions whatsoever. [*See* Filing No. 17-4 at 84-87.] Dr. Fine's addendum provided only the briefest discussion of Dr. LaRosa's treatment: "I have reviewed records from Dr. Michael S. Larosa, who is a physician in the Indianapolis area. I am not exactly sure if Dr. Larosa is an internist as he is not identified as such." [Filing No. 17-3 at 132.] This perfunctory statement could not possibly suffice to allow for "meaningful appellate review." *Halpin*, 962 F.2d at 695.

Nor is Dr. Fine's treatment of Dr. LaRosa's opinions saved by the earlier reviews rendered by Aetna and Nurse Shepler. Based on Nurse Shepler's initial review, Aetna wrote that Dr. LaRosa's restrictions "appear to be based on your subjective reports of symtpoms [sic], which is insufficient medical evidence to support impairment." [Filing No. 17-1 at 133.] In Nurse Shepler's follow-up review, she wrote that she was giving "greater weight" to the "[m]ultiple uro/gyn specialists" who had provided "no ongoing restrictions" over the assessment of the "primary care provider" because "they are the specialists for the condition." [Filing No. 17-3 at 58.] (Presumably by "multiple uro/gyn specialists" Nurse Shepler meant Dr. Rao, as she was the only urogynecologist who had rendered any opinion as to whether Ms. Garner required restrictions as a result of her conditions.)

First, Dr. LaRosa rendered further treatment and opinions after Aetna's initial denial and Nurse Shepler's follow-up review that warrant attention in their own right, as they are consistent with Dr. Hale's assessment that Ms. Garner required InterStim—which, as noted above, is reserved for patients with severe and persistent symptoms that go unremedied by more conservative treatments. Second, although each of the bases suggested by Nurse Shepler (that Dr. LaRosa's

opinion was based upon subjective complaints and that Dr. LaRosa is not a specialist) are not without support, Dr. Fine neither referenced these bases nor provided one of his own. In fact, Dr. Fine did not provide any reasoning at all for his wholesale rejection of Dr. LaRosa's opinions. Aside from the problematic discussion of Dr. Hale's records, Dr. Fine did not even "credit reliable evidence that conflicts with [the] treating physician's evaluation" which perhaps could justify the lack of a specific explanation. *Nord*, 538 U.S. at 834. Particularly given his shortcomings in addressing Dr. Hale's treatment records, the Court concludes that Aetna failed to give Ms. Garner a full and fair review by relying upon Dr. Fine's unreasoned rejection of Dr. LaRosa's treatment records.

### 3. Aetna's Remaining Arguments

Finally, Aetna's numerous citations to Dr. Rao's limitations worksheet, [*e.g.*, Filing No. 25 at 2], and to assorted evidence of "uncomplicated" surgeries or "normal" findings, [*e.g.*, Filing No. 25 at 26], do not alter the Court's conclusion.[14] Dr. Rao's worksheet was completed on December 27, 2016. [Filing No. 17-8 at 10-11.] While Aetna did not err in considering Dr. Rao's opinion, it cannot justify its denial based solely on that record given the near-unanimous treatment records following that opinion that demonstrate that Ms. Garner's conditions were worsening instead of improving.[15] Even more importantly, Dr. Fine did not mention or rely upon Dr. Rao's limitations worksheet in either his peer review or addendum.

Nor did Dr. Fine (or any other Aetna reviewer) rely upon the "uncomplicated" surgeries. This is likely because such findings indicated only that the surgery went as expected—not, as Aetna now seems to suggest, that they remedied Ms. Garner's conditions. The same is true with

---

[14] Nor do any other arguments raised by Aetna not specifically addressed herein.

[15] Again, the exception is the purported Dr. Hale opinion that he conveyed to Dr. Fine as part of his peer review.

the "normal" observations made in some medical opinions. As Aetna is keen to point out in its briefing, "the issue is whether she met the terms of" the Plan, "not whether she complained of or was diagnosed" with any particular medical condition. [Filing No. 25 at 1.] Whether a particular examination produced a particular normal finding is beside the point, as recognized in part by the fact that no Aetna reviewer relied upon such findings to justify the denial of benefits.

### B. Appropriate Remedy

Having concluded that Aetna's denial of benefits cannot stand, the Court must next determine the appropriate remedy. Ms. Garner argues that she is entitled to an award of front and back benefits. [Filing No. 20 at 25-26.] Aetna argues that remand is the appropriate remedy. [Filing No. 25 at 34-35.]

The Court has discretion to decide whether an erroneous denial of benefits warrants remand for further proceedings or an immediate award of benefits. *Halpin*, 962 F.2d at 697. Reversals for failure to provide adequate reasoning generally warrant remand for "further findings or explanations" except "where the record . . . contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled." *Majeski*, 590 F.3d at 484.

The Court has found that Aetna's decision is unreasonable based primarily upon insufficient reasoning—specifically, Aetna's reliance upon an inaccurate clinical review that misstated and omitted critical evidence. Deviation from the ordinary remedy of remand is not appropriate in this case, particularly because the parties' dispute regarding Dr. Hale's role in the disability process requires additional findings. On remand, Aetna should clarify the nature of Dr. Hale's opinion regarding Ms. Garner (preferably in writing) and reach a fresh conclusion based upon all of the evidence in the record.

## V.
### CONCLUSION

Aetna's decision to deny Ms. Garner benefits is entitled to deference. But Aetna is not entitled to rely upon critically flawed clinical reviews as the basis for its decision. The Court finds Aetna's denial of benefits to be arbitrary and capricious and therefore **GRANTS IN PART** Ms. Garner's Motion for Summary Judgment, [19], and **DENIES** Aetna's Motion for Summary Judgment, [18]. Remand, rather than an award of benefits, is the appropriate remedy in this case to allow Aetna to address the procedural errors identified herein. Final judgment will issue accordingly.

Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), the Court **ORDERS** that Ms. Garner file any petition for attorney's fees on or before **March 23, 2018**. The Court requests that the Magistrate Judge confer with the parties to discuss the possibility of a negotiated resolution as to the fee issue.

Date: 2/20/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**